UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA  DIVISION

UNITED STATES OF AMERICA

v.

CASE NO.   8:14-CR- 354 1 35 TGW

LISVET MARTINEZ

18 U.S.C. § 1347
18 U.S.C. § 1035
18 U.S.C. § 982 - forfeiture

**INDICTMENT**

The Grand Jury charges:

**COUNTS ONE THROUGH SIX**
**18 U.S.C. § 1347**
(Health Care Fraud)

**A. Introduction**

At all times material to this Indictment:

1.      Defendant Lisvet Martinez owned and incorporated Lissmart

Medical Supply, Inc. (LMS) in the state of Florida since September 2005 with her

husband.  LMS was a small business located in Tampa, Florida, in the Middle

District of Florida.  Defendant also registered and conducted business under the

name Lissmart Pharmacy (LP) in Tampa, Florida.  LMS was a Medicare

provider/supplier who was assigned supplier number 5709830001 and National

Council for Prescription Drug Program number 1030395 and National Provider

Identification Numbers 1669651840, 1851620629, and 1861446312, which were

used to bill and receive reimbursement from Medicare.  LMS was also a Medicaid provider with the Florida Medicaid Program who was assigned Medicaid Provider Numbers 031431500, 031893100 and 032313601. These Provider Numbers were used to bill and receive reimbursement from Medicare and Medicaid.

2.      In 2006, defendant submitted and signed a provider application for Medicare enrollment on behalf of LMS.  The application contained two certification statement pages where the supplier certifies that, "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier."  Further that, "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

3.      In 2007, defendant submitted a Florida Medicaid Provider Enrollment Application signed by defendant and her husband on behalf of LMS. The application contained a three page document entitled Non-Institutional Medicaid Provider Agreement.  By signing such agreement the provider/supplier certifies, among other things, that, "[t]he provider agrees to comply with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program [...]."  Further that, "[t]he services or goods must have been actually provided to eligible Medicaid [patients] by the provider prior to submitting the claim."

2

## THE MEDICARE PROGRAM

4.      The Medicare Program ("Medicare") was a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that provided medical benefits, items and services (collectively "services") to persons age 65 and older or with certain disabilities (hereinafter "beneficiaries"). Individuals who received benefits under Medicare were commonly referred to as Medicare beneficiaries.

5.      The Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"), oversaw and administered Medicare throughout the United States. CMS divided the United States into geographic regions and contracted with various companies in those regions to assist in the administration of Medicare and determine the appropriate level of reimbursement.  One such company for Florida claims was Cigna Government Services LLC (CGS).

## MEDICARE - PART B

6.      The Medicare Part B program, as established by the Social Security Act (Title 42, United States Code, Section 301, et seq.), provides supplementary medical insurance benefits for individuals typically aged 65 years and older who are entitled to Social Security benefits.  Medicare Part B covers non-institutional care such as physician services, medical equipment, supplies, diagnostic tests, and ambulance services.

3

7.     Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS) is any equipment that provides therapeutic benefits or enables the beneficiary to perform certain tasks that he or she is unable to undertake or otherwise carry out due to a certain medical condition, malformation or illness. DMEPOS includes equipment such as wheelchairs, hospital beds, prosthesis, food pumps, enteral nutritional formulas and other medically required items, which can withstand repeated use. It is primarily and customarily used to serve a medical purpose and not intended for use by healthy or uninjured individuals as a convenience item. Generally, it is not useful to a person in the absence of illness or injury; and it is appropriate for home use. A DMEPOS supplier is defined as a physician or other practitioner, or an entity other than a provider that furnishes health care services under Medicare. This type of entity or non-physician practitioner operates independently of a hospital or physician's office.

8.     CGS administered and processed all Medicare DMEPOS claims for those Medicare beneficiaries who permanently resided in Region C, which included the state of Florida. CGS, also referred to as the Durable Medical Equipment Administrative Contractor (DME MAC), pursuant to a contract with HHS, served as a fiscal intermediary to receive, adjudicate, and pay claims submitted by DME providers, which included Lissmart Medical Supply, Inc. (LMS). To perform its duties, CGS relied upon, in part, a CMS/HCFA publication known as the Medicare Carriers Manual. This manual is an administrative

4

manual which provides instruction to carriers, such as CGS, on how to perform their daily operations and the administration of the Medicare program.

9.      Medicare Part B generally reimburses 80 percent of the allowable charge for medically necessary DME and/or other medical services supplied to Medicare beneficiaries. Medicare Part B claims for services and equipment supplied by DME providers, such as LMS, were submitted for payment to CGS, a Medicare contractor, on either a "Health Insurance Claim Form" (CMS/HCFA Form 1500), or through an Electronic Medium Claim (EMC) system. These methods of filing claims required the submission of certain information relating to a specific patient or beneficiary, including, among other data, the following: a) the type of service and/or equipment provided, identified as a procedure code number or HCFA Common Procedure Coding System (HCPCS); b) the date of such service or supply; c) the name of the referring physician; d) the referring physician's Unique Physician Identification Number (UPIN) or National Provider Identifier (NPI); e) the charge of such services; f) patient's diagnosis; g) a certification by the provider as to the medical necessity of rendering such services or supplies; and h) the name and/or provider (billing) number of the DME provider.

10.     Items classified as DME may not be covered for payment purposes in every instance. Coverage is subject to the requirement that the equipment be medically necessary and reasonable for the treatment of an illness or injury, or to improve the functioning of a malformed body member. The patient's diagnosis

5

must warrant the type of equipment or supply being purchased or rented.  In some instances, a physician's prescription or written order and other medical information available is sufficient to establish that the equipment or supply is medically necessary.  In those instances when a prescription or written order is received, the DME provider must retain a copy in the patient's record.  For certain types of DME, as further described below, an order from the physician must be obtained by the supplier prior to the delivery of these items.  However, there are some DME items that require a DME Information Form (DIF) be submitted to the DME MAC along with the claim.

11.    The DIF reflects such information as the identity of the treating or attending physician, as well as facts establishing the medical necessity and the patient's medical condition regarding coverage criteria.  The DIF may be completed by the supplier.  By signing the DIF, the supplier certifies that "[...] the information provided is true, accurate and complete, to the best of my knowledge."  And that the supplier understands that "[...] any falsification, omission, or concealment of material fact associated with billing this service may subject me to civil or criminal liability."   CMS form 10126 is the specific DIF for enteral nutrition.  The supplier is required to answer six patient-specific questions related to enteral nutrition services. The information requested on said form includes - the method of administration: gravity, pump, oral, or syringe; whether the enteral nutrition is provided via a tube; also, if there is medical documentation that supports the medical necessity of enteral nutrition services.

6

12.    According to the Medicare Pricing, Data Analysis and Coding

(PDAC), Local Coverage Determinations (LCD), and National Coverage

Determinations (NCD) related to enteral nutrition services and supplies, these

services and supplies are covered, and thus reimbursable, only if all of the

following conditions are met:

1) a "[..] functioning gastrointestinal tract who, due to pathology to, or
nonfunction of, the structures that normally permit food to reach the
digestive tract, cannot maintain weight and strength commensurate with
his or her general condition." NCD, for Enteral and Parenteral Nutritional
Therapy (180.2).

2) an "[...] interference with the neuromuscular mechanisms of ingestion of
such severity that the beneficiary cannot be maintained with oral feeding."
NCD, for Enteral and Parenteral Nutritional Therapy (180.2).

3) in cases where "adequate nutrition must not be possible by dietary
adjustment and/or oral supplements."  LCD, for Enteral Nutrition.

4) The patient must require tube feedings to maintain weight and strength
commensurate with the patient's overall health status.

The LCD further states that "[...] products that are administered orally and related

supplies are noncovered" and that, if the nutrition is being administered orally,

modifier BO must be added to the claim.  A modifier is a code that provides

additional information regarding the service billed by the supplier.

## MEDICAID

13.    Medicaid is a federal health insurance program that provides

coverage for indigent persons, children, and certain disabled persons.  The

Medicaid program is a joint program with the states that is funded through both

7

federal and state tax revenue. HHS is responsible for the administration of the Medicaid program and CMS is the component agency of HHS that administers and supervises the Medicaid program. CMS delegates administration of the Medicaid program to the individual states. In Florida, the Agency for Health Care Administration (AHCA) is responsible for the administration of the Medicaid program. The State of Florida has contracted with HP Enterprise Services (HP), formerly known as Electronic Data System Corporation (EDS), as the fiscal agent to receive, adjudicate and pay certain Medicaid claims submitted to it by Medicaid beneficiaries and Medicaid providers in the State of Florida. The Medicaid Program is authorized by Title XIX of the Social Security Act. In Florida, the Medicaid Program is authorized by chapter 409, Florida State Statutes and Chapter 59G, Florida Administrative Code.

14.	In order to bill Medicaid for services rendered, the provider submits a claim on a CMS-1500 form to HP Enterprises Services, the Medicaid claims adjudication contractor, or sends the form to a billing service, which in turn, bills Medicaid on behalf of the provider. The CMS-1500 form is a standard claim form used by a non-institutional provider or supplier to bill Medicare carriers and durable medical equipment regional carriers (DMERC's) when a provider qualifies for a waiver the Administrative Simplification Compliance Act (ASCA) requirement for electronic submission of claims.

15.	When a Medicaid recipient is also receiving Medicare benefits, the Medicare coverage is the primary coverage. As such, if a patient has dual

8

coverage, generally speaking, Medicare will reimburse 80 percent of the allowable charge and Medicaid will reimburse the co-payment portion, or the additional 20 percent.  Thus, "crossover" claims are claims that have been approved by for payment by Medicare and sent to Medicaid for the payment of the medical deductible and/or co-insurance (20%) as determined by the Medicaid program limits.

16.    The Medicaid guidelines, as cited in the DME/Medical Supply Services and Limitations Handbook, states in pertinent part, the following:

1)    "Be individualized, specific and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs."

2)    "Be consistent with generally accepted professional medical standards as determined by the Medicaid program and not experimental or investigational."

3)    "Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."

4)    "Documentation of medical necessity must clearly state that the [patient] will require consumable medical supplies due to a permanent medical condition and include the diagnosis code(s) and pertinent to the patient's need for the item or service requested."

5)    "Written prescription no more than twelve months old, with the printed name and the date of signature of the patient's treating physician[...]"

6)    "All documentation of medical necessity must include the type of medical equipment, services or consumable goods ordered, including the type, quantity, frequency and length of need ordered or prescribed."

9

## B.  The Scheme and Artifice

17.     From at least in or about July 2006, and continuing through in or about March 2012, in the Middle District of Florida, and elsewhere,

### LISVET MARTINEZ,

the defendant herein, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of, a health care benefit program, that is, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

## C.  Manner and Means

18.     The manner and means by which MARTINEZ sought to accomplish the scheme and artifice included, among others, the following:

(a)      It was part of the scheme and artifice that MARTINEZ would and did systematically submit and cause to be submitted claims through LMS for reimbursement from Medicaid and from Medicare Part B  program for services not rendered and not provided to patients, that is, for enteral nutrition and for all supplies associated with enteral nutrition such as gravity, syringe and pump fed enteral supply.

(b)      It was further part of the scheme and artifice that MARTINEZ would and did submit and cause to be submitted claims through LMS to Medicaid

and Medicare Part B for reimbursement for enteral nutrition formula for patients who were not qualified, that is they were not receiving nutrition through a gastrostomy, jejunostomy, or nasogastric tube, but instead could swallow and receive nutrition orally and there was no diagnosis that would require nutrition to be administered via a tube.

(c)   It was further part of the scheme and artifice that MARTINEZ would and did complete and submit to the Medicare Part B program, DIF forms saying that LMS had medical documentation of such a condition when it did not, and specifying the type of tube used for administration when there was no tube used for administration.

(d) It was further part of the scheme and artifice that when MARTINEZ would and did submit and cause to be submitted claims through LMS to Medicaid and Medicare Part B for reimbursement for enteral nutrition formula for patients who were not qualified, MARTINEZ instead provided over-the-counter cans of nutrition and food supplement shakes, such as Ensure and Glucerna, and billed Medicaid and Medicare Part B under the code for enteral nutrition.  These over-the-counter products are not for use through a gastrostomy, jejunostomy, or nasogastric tube, but to be swallowed and received orally, and are not qualified for reimbursement.

(e)   It was further part of the scheme and artifice that MARTINEZ would and did perform acts and make statements to hide and conceal and to

11

cause to be hidden and concealed the purpose of the scheme to defraud and the acts committed in furtherance thereof.

### D. Execution of the Scheme and Artifice

19.     On or about the dates set forth below as to each individual count, in the Middle District of Florida, and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud Medicaid and Medicare, a health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare and Medicaid, LISVET MARTINEZ, the defendant herein did submit and cause to be submitted the following false and fraudulent claims for reimbursement to Medicaid and Medicare for services not rendered by Lissmart Medical Supply:

| COUNT | BENEFICIARY | CODE | DATE OF PURPORTED SERVICE | DATE OF CLAIM | AMOUNT CLAIMED | AMOUNT PAID & DATE | BY MEDICARE or MEDICAID |
|-------|-------------|------|------|------|------|------|------|
| ONE | CEM | B4154 (enteral formula) | 7/5/12 through 8/3/12 | 7/9/2012 | $800.00 | $137.46 on 7/16/12 | MEDICARE |
| TWO | CEM | B4036 (enteral feeding supply kit) | 3/10/10 through 4/8/10 | 3/22/2010 | $950.00 | $186.24 on 3/24/10 | MEDICARE |
| THREE | JROF | B4154 (enteral formula) | 6/4/2012 | 6/4/2012 | $4500.00 | $800.10 on 6/20/12 | MEDICAID |

| COUNT | BENEFICIARY | CODE | DATE OF PURPORTED SERVICE | DATE OF CLAIM | AMOUNT CLAIMED | AMOUNT PAID & DATE | BY MEDICARE or MEDICAID |
|-------|-------------|------|--------------------------|---------------|----------------|--------------------|-----------------------|
| FOUR | MYG | B4154 (enteral formula) | 1/15/2010 | 1/15/2010 | $1000.00 | $800.37 on 1/20/10 | MEDICAID |
| FIVE | JM | B4150 (enteral formula) | 10/6/09 through 11/4/09 | 11/16/2009 | $2139.00 | $156.00 on 11/18/09 | MEDICARE |
| SIX | JM | B4036 (enteral feeding supply kit) | 11/6/09 through 12/5/09 | 11/16/2009 | $950.00 | $186.24 on 11/18/09 | MEDICARE |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS SEVEN AND EIGHT
### (False Statements Relating to Health Care Matters - 18 U.S.C. § 1035(a)(2))

### Introduction

1.     The Grand Jury hereby re-alleges Paragraphs 1 through 12 of Counts One through Six of this Indictment and incorporates by reference those paragraphs as though fully set forth herein.

### The Charges

2.     On or about the dates set forth below in each count, in the Middle District of Florida, and elsewhere, in a matter involving a health care benefit program affecting commerce, that is, Medicare, the defendant herein,

LISVET MARTINEZ,

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and did make and use materially false writings

13

and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, that is, in submitting DIF forms in connection with payments under Medicare charged in Counts One, Two, Five, and Six listed herein, and causing the submission of such forms, the defendant did falsely claim that certain Medicare beneficiaries named below in each count, that there was documentation of a medical condition requiring administration of enteral nutrition via a tube, either a gastrostomy, jejunostomy, or nasogastric tube, when in fact there was no such documentation and the beneficiary did not in fact have such a condition and the beneficiary did not in fact require administration of enteral nutrition via a tube:

| COUNT | BENEFICIARY | DATE OF DIF FORM SUBMITTED | ENTITY TO WHICH DIF FORM WAS SUBMITTED |
|-------|-------------|---------------------------|----------------------------------------|
| SEVEN | CEM | 8/10/2009 | CIGNA on behalf of Medicare |
| EIGHT | JM | 11/5/2008 | CIGNA on behalf of Medicare |

All in violation of Title 18 United States Code, Sections 1035(a)(2) and 2.

## COUNTS NINE THROUGH  FOURTEEN
### 18 U.S.C. § 1347
(Health Care Fraud)

### A. Introduction

1.      The allegations contained in paragraphs 1 through 5 and 13 through 16 of Counts One through Six of this Indictment are hereby realleged and incorporated by reference herein.

### MEDICARE PART D

2.      In December 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act (MMA), amending the Social Security Act by adding Part D under Title XVIII.  The MMA allows Medicare payments to insurance plans that contract with CMS to provide qualified Part D prescription drug coverage to Medicare beneficiaries, as described in 42 C.F.R. §423.401 (referred to herein as "Plans" or Medicare drug plans).  It went into effect of January 1, 2006.  In essence, Part D subsidized the costs of prescription drugs for Medicare beneficiaries. In order to receive Part D benefits, a beneficiary must be enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies approved by Medicare, referred to as Plan "sponsors."  A beneficiary could fill a prescription at a pharmacy and use his or her Plan to pay for some or all of the prescription.

3.      A pharmacy could participate in Part D by entering a retail network agreement with one or more Pharmacy Benefit Managers ("PBM").  A PBM was an entity that provides pharmacy benefit management services, which may

15

include contracting with a network of pharmacies; establishing payment levels for network pharmacies; negotiating rebate arrangements; developing and managing formularies, preferred drug lists, and prior authorization programs; performing drug utilization review; and operating disease management programs.  Each PBM acted on behalf of one or more Medicare drug plan.  Through a Plan's PBM, a pharmacy could join the plan's network. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to the PBM that represented the beneficiary's Medicare drug plan.

4.     Plans must submit a summary record called the Prescription Drug Event (PDE) record to CMS every time a beneficiary fills a prescription covered under Part D. The PDE record contains prescription drug cost and payment data that enables CMS to make payments to the Plan and otherwise administer the Part D benefit.  As a matter of process, when prescriptions are filled, pharmacies submit claims to the Plan.  Generally, these claims are submitted electronically to the Plan.  Once a claim is adjudicated, the Plan pays the pharmacy for providing the Part D benefits to qualified Medicare beneficiaries.  The Plan then reconciles with, or seeks reimbursement from, CMS through the submission of the PDE records.

5.     As a measure of supervising and administering Medicare Part D, CMS has published the Part D Prescription Drug Benefit Manual (PDBM). Chapter 9 of the PDBM addresses how to Control Fraud, Waste and Abuse, and provides both interpretative rules and guidelines for Part D Plan sponsors on how

16

to implement the regulatory requirements under 42 C.F.R. §423.504(b)(4)(vi)(H) to have in place a comprehensive fraud and abuse plan to detect, correct and prevent fraud, waste, and abuse as an element of their compliance plan. Chapter 9 of the PDBM, Section 70.1.3, Pharmacy Fraud, Waste and Abuse, specifically cites examples of potential pharmacy fraud, waste and abuse, including billing for nonexistent prescriptions, prescriptions that are never picked up (i.e., not reversing claims that are processed when prescriptions are filled but never picked up) and billing for brand when generics are dispensed.

6.      A National Provider Identifier or NPI is a unique 10-digit number issued to health care providers in the United States by the Centers for Medicare and Medicaid Services (CMS). The NPI replaced the unique provider identification number (UPIN) as the required identifier for Medicare services, and is used by other payers, including commercial healthcare insurers.

7.      Under Florida law, unless a prescriber writes the words "medically necessary" on the face of a written prescription or expressly indicates so with an oral prescription, the pharmacist shall substitute the less expensive, generically equivalent drug product.

8.      On February 18, 2008, defendant Lisvet Martinez signed a Provider Agreement with PMB, Caremark, LLC (Caremark) on behalf of Lissmart Pharmacy to bill Medicare for prescriptions filled to eligible Medicare beneficiaries with certain Medicare Part D plans. By signing the Caremark Provider Agreement, Lissmart Pharmacy agreed to comply with all applicable

17

federal and state laws and regulations set forth in the Provider Manual. Both the April 1, 2009, and January 1, 2012, Provider Manuals required the following items, among others, in providing prescription services and drug products to eligible Medicare beneficiaries that:

1)      Provider maintain all documents, including original prescriptions (including electronic records), signature logs, ad wholesale, manufacturer and distributor invoices for at least three years, and as of the 2012 Manual, for at least six years;

2)      Provider agrees that the provider is subject to inspection and audit by Caremark;

3)      All prescriptions must follow state law with regard to dispensing prescriptions as written, including generic and brand prescriptions;

4)      Prescriptions must be sourced from a reputable manufacturer or distributor subject to regulatory oversight by agencies such as the FDA and the DEA. After January, 1, 2012, Providers were permitted to also source inventory from another duly licensed pharmacy if proper and specific documentation of such inventory transfers or purchases were kept, including exact quantities and names of medication(s) purchased, date(s) of purchases and proof of business to business financial transaction.

## B. The Scheme and Artifice

9.    From at least in or about August 2011, and continuing through in or about September 2012, in the Middle District of Florida, and elsewhere,

### LISVET MARTINEZ,

the defendant herein, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the control of, a health care benefit program, that is, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

## C. Manner and Means

10.    The manner and means by which MARTINEZ sought to accomplish the scheme and artifice included, among others, the following:

(a)  It was part of the scheme and artifice that MARTINEZ would and did submit and cause to be submitted claims through LP for reimbursement under Medicare Part D and Medicaid for prescribed medications that were not in fact prescribed by a physician, and for prescriptions that not provided to the patient;

(b) It was further part of the scheme and artifice that MARTINEZ would and did submit and cause to be submitted claims through LP for reimbursement under Medicare Part D and Medicaid for prescribed medications that were not in

fact purchased from the medication wholesaler or distributor, or when permitted and properly documented, from another licensed pharmacy;

(c)   It was further part of the scheme and artifice that MARTINEZ would and did submit and cause to be submitted claims through LP for reimbursement under Medicare Part D and Medicaid for brand name prescribed medications, instead of the generic prescribed medication, that were not in fact prescribed as "medically necessary" by a physician, and would and did submit and cause to be submitted claims for refills of these brand named medications that were also not prescribed as "medically necessary";

(d)   It was further part of the scheme and artifice that MARTINEZ would and did perform acts and make statements to hide and conceal and to cause to be hidden and concealed the purpose of the scheme to defraud and the acts committed in furtherance thereof.

### D. Execution of the Scheme and Artifice

11.   On or about the dates set forth below as to each individual count, in the Middle District of Florida, and elsewhere, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud Medicaid and Medicare, both health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare and Medicaid, LISVET MARTINEZ, the defendant herein did submit and cause to be submitted

the following false and fraudulent claims for reimbursement to Medicaid and

Medicare for services not rendered by Lissmart Pharmacy and not prescribed by

a physician:

| COUNT | BENEFICIARY | LISTED MEDICATION | DATE OF MEDICATION FILL/CLAIM | AMOUNT CLAIMED | AMOUNT PAID BY MEDICARE |
|---|---|---|---|---|---|
| NINE | C.R. | Humalog | 8/15/2011 | $355.29 | $355.29 |
| TEN | C.R. | Humalog | 9/15/2011 | $355.29 | $355.29 |
| ELEVEN | C.R. | Humalog | 10/13/2011 | $355.29 | $355.29 |
| TWELVE | C.R. | Humalog | 11/10/2011 | $355.29 | $355.29 |
| THIRTEEN | V.J. | Neurontin | 8/2/2012 | $385.78 | $379.28 |
| FOURTEEN | V.J. | Neurontin | 9/4/2012 | $385.78 | $379.28 |

All in violation of Title 18, United States Code, Section 1347 and 2.

**FORFEITURES**

1.     The allegations contained in Counts One through Six and Nine

through Fourteen of this Indictment are hereby realleged and incorporated by

reference for the purpose of alleging forfeitures pursuant to Title 18, United

States Code, Section 982(a)(7).

2.     Upon conviction of the offense charged in Counts One through Six

and Nine through Fourteen of this Indictment, in violation of Title 18, United

States Code, Section 1347, the defendant,

21

LISVET MARTINEZ,

shall forfeit to the United States of America, pursuant to Title 18, United States
Code, Section 982(a)(7), any property, real or personal, that constitutes or is
derived, directly or indirectly, from gross proceeds traceable to the commission of
the offenses. The property to be forfeited includes, but is not limited to, a
forfeiture money judgment in the amount of at least $124,676.25, representing
the proceeds the defendant received as a result of the scheme charged in
Counts One through Six, and $126,973.02 representing the proceeds the
defendant received as a result of the scheme charged in Counts Nine through
Fourteen.

3.      If any of the property described above, as a result of any act or
omission of the defendant:

   (a)    cannot be located upon the exercise of due diligence;

   (b)    has been transferred or sold to, or deposited with, a third party;

   (c)    has been placed beyond the jurisdiction of the court;

   (d)    has been substantially diminished in value; or

   (e)    has been commingled with other property which cannot be
          divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

22

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

18, United States Code, Section 982(b)(1).

A TRUE BILL,

Foreperson

A. LEE BENTLEY, III
United States Attorney

By: _____

KELLEY C. HOWARD-ALLEN
Assistant United States Attorney

By: _____

ROBERT A. MOSAKOWSKI
Assistant United States Attorney
Chief, Economic Crimes Section

23

FORM OBD-34
APR 1991

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.

## LISVET MARTINEZ

## INDICTMENT

Violations:

18 U.S.C. § 1347
18 U.S.C. § 1035

A true bill,

_____
Foreperson

Filed in open court this ___21st___ day

of August, 2014.

_____
Clerk

Bail    $_____